20 N.J. Super. 531 (1952)
90 A.2d 151
WILLIAM JACOBS, PLAINTIFF,
v.
JOHN R. MARTIN, DIRECTOR OF PUBLIC AFFAIRS OF THE TOWN OF IRVINGTON, ET ALS, DEFENDANTS.
Superior Court of New Jersey, Chancery Division.
Decided June 20, 1952.
*532 Mr. James Edward Fagan for the plaintiff (Messrs. Gilhooly, Yauch & Fagan, attorneys; Mr. Edward J. Gilhooly, of counsel and on the brief).
Mr. Matthew Krafte for the defendants.
*533 FREUND, J.S.C.
William Jacobs, a duly licensed physician and surgeon of this State, maintaining an office in the Town of Irvington since 1936 and a member of the "courtesy staff" of the Irvington General Hospital since 1938, brings this action against John R. Martin, director of public affairs of the municipality and the members of the "senior attending staff" of the hospital to restrain them from denying him the right to perform "major surgery" upon his patients in the hospital. There is no dispute as to the plaintiff's right to the use of the facilities of the hospital for all other purposes, including the performance of "minor surgery." The narrow issue raised by the proceeding is whether the action of the defendants in prohibiting the plaintiff from performing "major surgery" was proper and lawful.
Since the plaintiff met and passed the requirements of the State Board of Medical Examiners, it is not the court's province to pass upon his qualifications. He has an unlimited license to practice medicine and surgery in this State, issued in accordance with R.S. 45:9-15, which license has never been suspended or revoked pursuant to R.S. 45:9-16.
The plaintiff is now about 42 years of age. A member of Phi Beta Kappa, he was graduated from Rutgers University in 1930 with a Bachelor of Arts degree. His medical education was received at George Washington Medical School, from which he graduated in 1935 with honors. He served his interneship in recognized hospitals and has pursued postgraduate courses in surgical technique. In 1936, upon receiving his license to practice medicine and surgery in this State, he commenced practice in Irvington. From January 1941 until August 1945 he was in the United States Army, serving as attending surgeon at Fort Bragg, North Carolina, and later as battalion surgeon in the European theatre of operations. Upon his honorable discharge, he resumed practice in Irvington.
The Irvington General Hospital is the only hospital in Irvington and is a public institution operated and maintained *534 by the town. It is used by residents of Irvington, including the patients of the plaintiff. In 1938, the plaintiff was made a member of the "courtesy staff" of the hospital. He testified that in 1945 he was a member of the surgical staff and performed major operations upon his patients and assisted other doctors in like operations. By letter dated March 3, 1950, signed by the secretary of the hospital staff, he was notified that at a recent meeting the staff decided, "That you will operate with a member of the Surgical Committee assigned, and that this Committee will endeavor to equalize the number of cases which each member will supervise." Under date of March 20, 1950, he was informed by letter "that at the last regular meeting of the Medical Staff of the Irvington General Hospital, the Staff has decided that you are to have no privileges to do major surgery." The meetings of the staff preceding these communications were held without notice to or attendance by the plaintiff. He had not been notified or apprised of any charges against him; and, in fact, none have been made or filed against him. The revocation of his right or privilege to perform major surgery upon his patients was without cause so far as any formal record is concerned.
The Town of Irvington operates under the Walsh Act, and the hospital was established under the authority of R.S. 30:9-13. The municipality has adopted two ordinances respecting the operation of the hospital. The first, No. 749, was adopted on September 29, 1925, and the second, No. 1256, adopted on June 24, 1930, amended the former. Originally, it was provided that the hospital should be managed by and operated under the supervision of a board of trustees composed of nine citizens, but no Board was ever appointed. The amendatory ordinance provided that the management and operation of the hospital be referred to a director of one of the departments of the town commission, who "shall make rules and regulations in reference to the * * * duties of * * * attending, assistant attending, consulting and adjunct staffs, and shall do and perform all *535 other such acts as may be necessary for the proper management and government of the Hospital."
The amendatory ordinance further prescribed:
"The General Staff of the Hospital shall consist of the attending, assistant attending, consulting and adjunct attending physicians, who shall be appointed by the Director of the Department to which the management and operation of the Hospital has been assigned, subject to confirmation by the Board of Commissioners. The members of said staff shall have the qualifications set forth in Article III of the Ordinance of which this ordinance is amendatory, and shall remain members of the General Staff during the pleasure of the Director of the Department to whom the management of the hospital is assigned. * * *"
The pertinent portion of Article III of Ordinance No. 749 reads:
"* * * The members of the said staff shall be physicians regularly licensed to practice in the State of New Jersey, and they shall remain members of said General Staff during the pleasure of the Board (of Trustees)."
From 1934 to 1950 the management of the hospital was under the direction of Percy A. Miller, Jr., the Director of Public Affairs of the municipality, and since May 16, 1950 under his successor on the town commission, the defendant, John R. Martin.
Notwithstanding the provisions of the ordinances, neither the board of commissioners or the directors of public affairs prepared or formulated any written rules and regulations pertaining to the hospital. Director Miller testified that it was his policy as administrator of the hospital to conform to the standards of the American Hospital Association and other similar organizations; that while they were not published or reprinted by him, he used them as guides in his administration. However, no formal rules and regulations were available to interested persons, although their adoption was required by the ordinances.
Both Miller and Martin are laymen, and in the administration of the hospital relied upon the recommendations of *536 the medical staff, which had adopted a constitution and rules and regulations. They are undated, but the preamble recites that "twenty-five years ago" physicians then practicing in Irvington organized themselves in a group known as the medical staff of the Irvington General Hospital and adopted a constitution and by-laws. The minutes of the annual meeting of the medical staff held on May 20, 1949, recorded that the constitution and the rules and regulations as amended were accepted and approved. The constitution offered in evidence is undated and bears the signatures of John F. Lovell and Clement H. Golden, president and secretary respectively of the medical staff, and of Percy A. Miller, Jr., approving the same as director. It provides, inter alia:
"Article IV. Divisions of the Medical Staff.
Section 1. The Medical Staff. The medical staff shall be divided into honorary, consulting, active, associate, and courtesy groups.
Section 5. The Courtesy Medical Staff. The courtesy medical staff shall consist of those members of the medical profession, eligible as herein provided for medical staff membership, who wish to attend private patients in the hospital, but, who do not wish to become members of the active medical staff or who, by reason of residence, are not eligible for such appointment. They shall be appointed in the same manner as other members of the medical staff and they shall have such privileges as may be determined by the committee on qualifications and privileges as hereinafter explained in this constitution."
There is no provision in the constitution and rules and regulations requiring any special qualifications, training or experience in order to perform surgery at the hospital.
The following rules of the medical staff are pertinent here:
"20. Any staff member who, upon investigation, has been found guilty of unprofessional or unethical conduct, or violation of the constitution and by-laws of this staff may be recommended for suspension or expulsion for such conduct or violation."
Rule 21 provides that such action must be preceded by presentation of the charges in writing, and an appearance before the executive committee of the medical staff, who shall *537 present their findings to the senior attending staff, before whom the accused may appear in his own defense. The senior attending staff shall "make a determination of guilt or innocence, together with its recommendations as to penalty, which if appealed from, shall be considered by the director who may affirm or reverse the determination. * * *" By Rule 22, a two-thirds vote of the senior attending staff is necessary for the recommendation to suspend or expel any member.
Whatever may be the legal effect of the constitution and the rules and regulations of the medical staff upon the rights and privileges of the plaintiff, were we merely for the purposes of this proceeding to accord them binding effect, it is nevertheless true that no charges were ever preferred against the plaintiff. The defendants, members of the medical staff, testified that there was no specific complaint made against the plaintiff. If there was any basis for the suspension or revocation of the plaintiff's privileges, the procedure stipulated by the rules and regulations of the staff should have been followed and in conformity therewith the plaintiff should have had an opportunity to appear and defend himself. The absence of compliance with their own rules and regulations renders invalid the disciplinary action of the medical staff.
The plaintiff contends that he has the right to use the facilities of the hospital for surgery "under the same terms and conditions as those afforded to any other person licensed to practice medicine and surgery at said institution." The defendant, Director Martin, contends that he will not permit plaintiff to perform major surgery because "it is his studied opinion * * * that the plaintiff lacks sufficient training and experience in the field of major surgery," that the staff serves "at his pleasure" and that he may "at his pleasure" remove physicians from the staff.
The issue seems to be of first impression in this State. However, the broad question underlying the narrow issue involved in this case has been considered in other jurisdictions. *538 The general rules pertaining to the subject are clear and well-settled. A municipality may, of course, establish a public hospital.
"The board or persons to whom (supervisory) power may be delegated may prescribe reasonable rules and regulations for the proper management and government of a public hospital. Subject to the qualification that such board or governing body must exercise such power within the limits of its constitutional or statutory powers, it may exercise its discretion in the making of reasonable rules and regulations, although it has been held that the reasonableness of a regulation of this kind is a question of law." 41 C.J.S., Hospitals, § 5, page 337.
A hospital may prescribe reasonable rules concerning the qualifications of physicians allowed to practice therein. While the issuance of a license to practice medicine and surgery by the State Board of Examiners evidences the qualifications and the right of the holder thereof to practice within the State, it does not give him the right per se to practice in a municipal institution. Hayman v. Galveston, 273 U.S. 414, 47 S.Ct. 363, 71 L.Ed. 714 (1927); Findlay v. Board of Supervisors of County of Mohave, 72 Ariz. 58, 230 P.2d 526 (Sup. Ct. 1951); Newton v. Board of Commissioners of Weld County, 86 Colo. 446, 282 P. 1068 (Sup. Ct. 1929); Richardson v. City of Miami, 144 Fla. 294, 198 So. 51 (Sup. Ct. 1940); City of Miami v. Oates, 152 Fla. 21, 10 So.2d 721 (Sup. Ct. 1942); Green v. City of St. Petersburg, 154 Fla. 339, 17 So.2d 517 (Sup. Ct. 1944); Bryant v. City of Lakeland, 158 Fla. 151, 28 So.2d 106 (Sup. Ct. 1946); Lambing v. Twin Falls County, 45 Idaho 468, 263 P. 992 (Sup. Ct. 1928); Selden v. City of Sterling, 316 Ill. App. 455, 45 N.E.2d 329 (Sup. Ct. 1942); Hamilton County Hospital v. Andrews, 227 Ind. 217, 84 N.E.2d 469, 85 N.E.2d 365 (Sup. Ct. 1949); Stevens v. Emergency Hospital of Easton, 142 Md. 526, 121 A. 475 (Ct. App. 1923); Henderson v. City of Knoxville, 157 Tenn. 477, 9 S.W.2d 697 (Sup. Ct. 1928); Harris v. Thomas, 217 S.W. 1068 (Tex. Civ. App. 1920); Johnson v. City of Ripon, 259 Wis. 84, 47 N.W.2d 328 (Sup. Ct. 1951).
*539 In Hayman v. Galveston, supra [273 U.S. 414, 47 S.Ct. 364], the United States Supreme Court said:
"* * * it cannot, we think, be said that all licensed physicians have a constitutional right to practice their profession in a hospital maintained by a state or a political subdivision, the use of which is reserved for purposes of medical instruction. It is not incumbent on the state to maintain a hospital, for the private practice of medicine * * *. But it is argued that, if some physicians are admitted to practice in the hospital, all must be, or there is a denial of the equal protection of the laws."
Respecting state laws, the court said:
"* * * the provision is obviously directed to the qualifications of those to be admitted to the practice of their profession in the state and has nothing to do with the qualifications of those who are to be allowed to practice in a state hospital."
In 26 Am. Jur. 592, Hospitals and Asylums, § 9, it is stated:
"* * * the rule applied to public hospitals (is that) a regularly licensed physician and surgeon has a right to practice in the public hospitals of the state so long as he stays within the law and conforms to all reasonable rules and regulations of the institutions. * * *"
In Henderson v. City of Knoxville, supra [157 Tenn. 477, 9 S.W.2d 698], the court said:
"But neither the city nor the hospital authorities can prescribe rules or regulations that contravene or conflict with the state laws. * * * To empower a manager of a hospital to refuse a physician admittance or to expel him, if his conception of professional conduct did not comport with his own, would be a dangerous thing. A physician might be in to-day and out to-morrow, depending upon the whim and caprice of the particular individual who happened to be manager."
In Findlay v. Board of Supervisors, &c., supra [72 Ariz. 58, 230 P.2d 530], the court declared:
"Any public hospital having adopted reasonable rules and regulations governing the practice of medicine or surgery cannot arbitrarily *540 preclude a regularly licensed physician or surgeon the right to practice in such hospital, so long as such surgeon or physician stays within the law."
Obviously, a municipality in the exercise of its duty, to prescribe reasonable rules and regulations should set up standards or qualifications for those who wish to serve in the hospital; these should be general and not arbitrary or discriminatory; they should be clear and not vague, ambiguous or uncertain. Thus, it would be perfectly reasonable for a municipality or those charged with the administration of the hospital to require that in order to perform major surgery, the physician be a diplomate in surgery, a fellow of the American College of Surgeons, or that he serve a probationary period. Such rules and regulations being general and equally applicable to all licensed doctors would be merely a means of defining and clarifying in the public interest the standards of the institution.
In Green v. City of St. Petersburg, supra [154 Fla. 339, 17 So.2d 518], the court said:
"These rules * * * are not for the purpose of discriminating against any physician but all are required to conform to them as a prerequisite to the use of its facilities for major operations. * * *
The practice of major surgery is a highly specialized field and is recognized as a delicate art. The majority of physicians admit that it requires special skill and training. * * * Most assuredly, when a municipality furnishes a hospital, operating room and other facilities * * * and is responsible to patients for the negligent use of these facilities, it has a right to know that they are placed in the hands of an expert. If this is not true, the City and the taxpayer have no protection whatever. * * *
The challenged rules, obviously, were promulgated in behalf of the hospital and for the protection of patients undergoing major operations against possible unethical or unskilled licensed practitioners. It seems to me that such reasonable rules promote the interest of the public and general welfare and likewise encourages a high professional standard of requirements for major surgery. * * * The general interest of such patients must be protected simultaneously with advancement in the practice of surgery."
However, in the instant case, as already shown above, the town and its directors did not formulate any set of rules *541 and regulations. The defendant, director of public affairs, claims the right to act "at his pleasure." Such conduct is arbitrary and contrary to public policy or good administration.
The rules and regulations of the medical staff have no binding effect, except as the plaintiff voluntarily agreed to be bound thereby. But it is obvious from the testimony that the medical staff failed to set up satisfactory standards or qualifications. They failed to observe those regulations pertaining to the filing of charges against a member of the staff or to hold a hearing thereon before recommending to the director so serious a consequence as the deprivation of the plaintiff's privileges.
Clearly from the testimony, the plaintiff's privilege of performing major surgery upon his patients, residents of the Town of Irvington who may be lawfully admitted to the hospital, has been, and is being, arbitrarily denied him. He is being deprived of the privilege without justifiable cause being stated. If there is justifiable cause, he has not been apprised of it nor given an opportunity to defend himself. It is significant, moreover, that although the medical staff found the plaintiff capable of performing major surgery under supervision, they arbitrarily refused to furnish such supervision when requested by him.
The plaintiff is entitled to a judgment.